Page 1

UNITED STATES DISTRICT COURT

CALIFORNIA NORTHERN DISTRICT (SAN JOSE)

- - -

```
PAULO ARANDA,                        )
                                     )
              Plaintiff,             )
                                     )
         vs.                         )  No. 5:06-CV-04738-JW
                                     )
NTH CONNECT TELECOM, INC.,           )
STEVEN CHEN, DOES 1 to 15,           )
                                     )
              Defendants.            )
-----------------------------------
```

DEPOSITION OF

DANIELLE SILVA

SAN JOSE, CALIFORNIA

JUNE 6, 2007

ATKINSON-BAKER, INC.
COURT REPORTERS
www.depo.com
(800) 288-3376

FILE NO.:  A104C6C

REPORTER BY:   NANCY E. PRESANT-McDONALD, CSR NO. 9906

Page 2

```
1
2              UNITED STATES DISTRICT COURT
3          CALIFORNIA NORTHERN DISTRICT (SAN JOSE)
4                      - - -
5   PAULO ARANDA,              )
                               )
6          Plaintiff,    )
                               )
7      vs.              ) No. 5:06-CV-04738-JW
                               )
8   NTH CONNECT TELECOM, INC.,       )
    STEVEN CHEN, DOES 1 to 15,       )
9                              )
           Defendants.        )
10  --------------------------------
11
12
13
14
15      Deposition of DANIELLE SILVA, taken on behalf
16  of Plaintiff, at 12 South First Street, Suite 613, San
17  Jose, California, commencing at 9:58 a.m., June 6, 2007
18  before Nancy E. Presant-McDonald, CSR No. 9906.
19
20
21
22
23
24
25
```

Page 3

```
1              A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4   DAL BON & WANG
    BY:  JAMES DAL BON, ESQUIRE
5   12 South First Street
    Suite 613
6   San Jose, California  95113
    (877) 841-3044
7
8   FOR THE DEFENDANTS:
9   FRIEDMAN ENRIQUEZ & CARLSON
    BY:  GRANT A. CARLSON, ESQUIRE
10  433 North Camden Drive
    Suite 965
11  Beverly Hills, California  90210
    (310) 273-0777
12
13  ALSO PRESENT:
14  STEVEN CHEN
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1                  I N D E X
2   WITNESS:  DANIELLE SILVA
3   EXAMINATION                      PAGE
4      BY MR. DAL BON                5
5
6   EXHIBITS
                        PLAINTIFF'S
7   LETTER        DESCRIPTION          PAGE
8   A       Check log           46
9   B       Copy of check, Bates stamped   48
            NC0053
10
    C       Copy of check, Bates stamped   50
11          NC0052
12  D       Copy of check, Bates stamped   56
            NC0051
13
    E       Group exhibit of copies of   57
14          checks, Bates stamped
            NC0044 to NC0050
15
    F       Group exhibit of copies of   63
16          checks, Bates stamped
            NC0055 to NC0076
17
    G          Response to Plaintiff's    71
18          Request for Documents
19  QUESTIONS WITNESS WAS INSTRUCTED NOT TO ANSWER
20          (NONE)
21
22  INFORMATION TO BE SUPPLIED:
23          PAGE    LINE
24          (NONE)
25
```

Page 5

```
1              DANIELLE SILVA,
2        having first been duly sworn, was
3        examined and testified as follows:
4           EXAMINATION BY MR. DAL BON
5    Q.  State your name for the record.
6    A.  Danielle Silva.
7    Q.  And your address?
8    A.  39481 Galahad Drive, Apartment 131, Fremont,
9   California 94538.
10   Q.  Danielle, have you ever had your deposition
11  taken before?
12   A.  No.
13   Q.  Have you had an opportunity to speak to -- are
14  you represented by an attorney today?
15       MR. CARLSON:  Yes.
16       MR. DAL BON:  Okay.
17   Q.  Have you had an opportunity to speak to your
18  attorney?  I don't want to know the contents of that
19  conversation.  I just want to know whether you've had an
20  opportunity to speak to him before the deposition.
21   A.  Yes.
22   Q.  Let me kind of explain or give you the ground
23  rules to a deposition.  I'm sure your attorney will jump
24  in if he believes that anything I'm saying is incorrect.
25       Today, you're giving testimony as if you're in
```

Page 6

1  a court of law, okay? So even though the proceedings
2  are informal -- for example, I don't have a tie on, just
3  a shirt, okay, and we're sitting in my office at a
4  table, and there's boxes there in the corner of the
5  office, okay -- believe it or not, the testimony you're
6  giving today is the same testimony or the same -- has
7  the same legal effect as it would in a court of law.  So
8  you've been sworn under the penalty of perjury.  You
9  have a duty to do your best to answer the questions, and
10 of course, to answer them truthfully, okay?  The penalty
11 of perjury means that you could be charged with a felony
12 if it is found you intentionally lied under oath today,
13 okay?
14     A.  Okay.
15     Q.  I don't want to know answers to questions that
16 you don't know basically.  So if you don't know the
17 answer to a question, just say look, I don't know, okay?
18     A.  Okay.
19     Q.  If you can't remember the answer to a question,
20 please tell me that you can't remember, okay?  You know,
21 I'm not trying to find out things that you don't know,
22 and I'm not trying to find out things that you don't
23 remember.  This isn't an interrogation, okay?  I'm not a
24 police officer.  I'm an attorney.
25     If you want to stand up and walk around, if you

Page 7

1  want a glass of water, I think we've got some bottled
2  water here.  I'm not sure.  You can ask for a bottle of
3  water.  If you want to use the restroom, you can of
4  course excuse yourself, and if you want to talk to your
5  attorney before you answer a question, that is okay,
6  too, and you can talk to your attorney of course out of
7  my presence, okay?
8        Now, there's some debate on whether deponents
9  can guess at an answer or not.  I'd prefer you not
10 guess, okay?  For example, if I ask you how long this
11 table is, okay, don't guess at it.  Tell me six feet.
12 You can give me an estimate.  I estimate that it's six
13 feet.  See what I'm saying?
14     A.  Uh-huh.
15     Q.  So there's a difference between guessing and
16 estimating.  If you feel the need or if there is a need
17 for an estimate, make it clear before you answer it that
18 it is an estimate and that may happen today because
19 we're dealing with numbers, okay, and sometimes with
20 numbers you have to give estimates.
21     I want to kind of get it clear who's present.
22 My name is James Dal Bon.  I am the plaintiff's
23 attorney.
24     Who is this gentleman sitting at the head of
25 the table?

Page 8

1        MR. CARLSON:  Steven Chen.  He is the owner of
2  Defendant, Nth Connect.
3        MR. DAL BON:  Okay.
4        MR. CARLSON:  Attorney Grant Carlson is the
5  attorney for Nth Connect.
6        MR. DAL BON:  And you're representing Danielle
7  today, correct?
8        MR. CARLSON:  That's correct.
9  BY MR. DAL BON:
10     Q.  Are you an employee of Mr. Chen?
11     A.  Yes, I am.
12        MR. CARLSON:  I'm going to object.
13        MR. DAL BON:  Why?
14        MR. CARLSON:  Well, she's an employee of the
15 company.
16 BY MR. DAL BON:
17     Q.  Okay.  Are you an employee of the company?
18     A.  Yes, I am.
19     Q.  And is Mr. Chen your supervisor?
20     A.  Yes.
21     Q.  What do you do for the company?
22     A.  I am operations finance manager.
23     Q.  How long have you worked in that capacity?
24     A.  At this position, for about a month.
25     Q.  What did you do before?

Page 9

1     A.  I was payroll supervisor.
2     Q.  How long did you work in that capacity?
3     A.  Five months.
4     Q.  From when to when?
5     A.  From November until the beginning of May.
6     Q.  Is that November of 2006?
7     A.  Yes.  November of 2006 to April 2007.
8     Q.  So from April of 2007 to the present you've
9  been --
10     A.  Finance manager.
11     Q.  How about before November 2006?  What did you
12 do?
13     A.  I was not working for the company between July
14 of 2006 and November of 2006.
15     Q.  Why weren't you working for the company between
16 that time period?
17     A.  I quit for those three months.
18     Q.  What was the reason you quit?
19     A.  Schedule problems.
20     Q.  What type of schedule problems?
21     A.  I could not be on the schedule that they wanted
22 me to.
23     Q.  What kind of a schedule did they want you to be
24 on?
25     A.  I needed to be there at 7:30 in the morning,

Page 10

1  and I cannot.  I have a baby.
2      Q.  Okay.  Child care?
3      A.  Yes.
4      Q.  Before July of 2006, what did you do for them?
5      A.  I worked from August of 2005 -- oh, not August,
6  sorry -- September of 2005.
7      Q.  To what?
8      A.  Until July of 2006 as office assistant.
9      Q.  What did you do before that, if anything?
10     A.  With the company?
11     Q.  Yeah.
12     A.  Nothing.
13     Q.  So you've not -- was September of 2005 your
14 first day of work?
15     A.  Yes.
16     Q.  So we have office assistant?  All right.  You
17 worked as an office assistant from September of 2005 to
18 July of 2006; is that correct?
19     A.  Yes.
20     Q.  Can you tell me what your duties were?
21     A.  We are contractors for Comcast, and on that
22 job, we have paperwork that needs to be checked in every
23 day.  So I checked in all the paperwork for the field
24 technicians, and I did billing basically on that
25 paperwork, so invoicing for Comcast and related to that

Page 11

1  was payroll.
2      Q.  So let's back up.  You said you checked in
3  paperwork -- you were contractors for Comcast, and you
4  checked in paperwork.
5          What do you mean by checked in paperwork?
6      A.  We have field technicians.  They go out to
7  customers house to complete jobs, and those jobs have
8  paperwork that needs to be completed.  They send that
9  paperwork back to our company, to Nth Connect, and that
10 paperwork needs to be checked for completion and
11 corrections and all the requirements that Comcast wants,
12 and then it's sent back to Comcast for their files.
13     Q.  So field technicians go out to -- is it
14 residences?
15     A.  Yes.
16     Q.  They go out to a residence; they do a job,
17 okay; they complete paperwork?
18     A.  Uh-huh.
19     Q.  And they sent the paperwork back to you?
20     A.  Uh-huh.
21     Q.  What would you check that paperwork for?
22     A.  For customer signature, completion calls, time
23 frames and make sure that they have all the paperwork
24 that was assigned to them.
25     Q.  What do you mean all the paperwork?  What

Page 12

1  paperwork?
2      A.  Well, they have a route that's assigned to them
3  every day in the morning.  Let's say they have six jobs
4  assigned for that day.  So they have six jobs that need
5  paperwork to be returned.
6      Q.  So you had a piece of paper with their route on
7  it, okay?
8      A.  Yes.
9      Q.  And you would make sure that you received
10 paperwork on each job on their route; is that correct?
11     A.  Yes.
12     Q.  And in their paperwork, you would check for the
13 customer's signature.
14         By time frames, did you charge the customer on
15 an hourly basis?
16     A.  No.
17     Q.  Why were you checking time frames?
18     A.  Because we need to make sure that our
19 technicians are doing their jobs on time.  They have
20 windows they have to --
21     Q.  So you had an estimate -- the company had an
22 estimate as to how much time it would take to do a
23 particular job; is that correct?
24     A.  I have never done that type of estimate, no,
25 but I did check what time they did their jobs.

Page 13

1      Q.  By "check what time they did their jobs," what
2  do you mean?  Would you check when they would enter the
3  house and leave the house?
4      A.  They had to write down that on the paperwork.
5      Q.  Entry time?
6      A.  Start and stop time of the jobs.
7      Q.  So what would you check that for?
8      A.  Because -- well, that's for billing purposes.
9  Comcast charges us back for jobs that are not completed
10 on time.
11     Q.  Oh, okay.  Do you remember how long Comcast
12 gave your technicians to complete a job before they
13 would start charging back?
14         MR. CARLSON:  Object as vague and ambiguous as
15 to a job.  It assumes there's only one type of job.
16 BY MR. DAL BON:
17     Q.  You can answer the question if you understand
18 it.
19     A.  I'm not sure what you're --
20     Q.  Do you recall -- you just testified that
21 Comcast would charge you folks if the technicians
22 remained on the job longer than the time that they felt
23 was appropriate; is that correct?
24     A.  No.  That's not correct.  They charged us back
25 if, for example, a job is supposed to be done between

Page 14

1   8:00 and 10:00 a.m. and a technician does not arrive at
2   the customers house until 10:15, that's when they charge
3   us back when we're late to start a job. It doesn't
4   matter how long the job takes.
5       Q. So it didn't matter how long the job would
6   take?
7       A. No.
8       Q. They wanted these people there at the
9   prescribed time?
10      A. Yes.
11      Q. Oh, okay. So if you had six jobs in a day, do
12  you recall the intervals that they were set at? In
13  general, when would the technician be expected to show
14  up to his first job, in general?
15      A. Well, in general, the first time frame is
16  between 8:00 and 10:00. They have to be at the
17  customer's house anytime between 8:00 and 10:00.
18      Q. In general, how long before they had to be at
19  the next job; in other words, if he was supposed to be
20  there at 8:00, would he be expected to be at the next
21  job at 10:00 or at 9:00?
22      A. It depends on how their route is. We have
23  various time frames during the day.
24          MR. CARLSON: Hold the next question. I have
25  to talk to my client real quick. I'll be right back.

Page 15

1           MR. DAL BON: Let the record reflect that the
2   attorney is leaving with Mr. Chen.
3           (Recess taken.)
4           MR. CARLSON: Okay. You can go back on.
5   BY MR. DAL BON:
6       Q. So in general, give me an estimate as to if
7   somebody started a job at 8:00 when would they be
8   expected to start their next job.
9       A. It depends on what type of job it is. They
10  have small jobs. They have big jobs. Sometimes a job
11  takes 15 minutes. Other jobs will take one to
12  two hours.
13      Q. So on any given route, how many small jobs
14  would they usually have?
15      A. I don't know. It depends. I cannot give you a
16  specific answer because it all depends on what type of
17  jobs Comcast assigns to us on a given day. Sometimes
18  it's heavier. Sometimes it's lighter. So there's not a
19  pattern -- a specific pattern.
20      Q. So you would keep track of when the technician
21  would show up to his first job; is that correct?
22      A. No. What I kept track was how many jobs were
23  completed on a certain -- late or not so that when we
24  received a file back from Comcast saying that we have
25  so-and-so late jobs, we would have somebody else check

Page 16

1   if that was correct or not for charge back basis.
2       Q. No. But you just testified earlier -- I'm a
3   little confused. You just testified earlier that part
4   of your job was to check time frames on a daily basis?
5       A. It was to check paperwork, and in the
6   paperwork, I checked about ten other things, and the --
7       Q. But one of the things was the time frames,
8   right?
9       A. Yeah.
10      Q. So isn't it true that if you were checking time
11  frames every day, you were checking to see when they
12  arrived at their first job? Wouldn't that be included
13  in the time frames?
14      A. Yes.
15      Q. So part of your job was to check to see when
16  they arrived at the first job; isn't that correct?
17      A. Yes. Mostly what time they start -- yeah.
18  Yeah, that's correct. I'm sorry. That's correct.
19      Q. Okay. So that's correct?
20      A. Yes.
21      Q. So you were a little confused earlier. And
22  then also a part of that job was to check when they
23  completed their last job, isn't that correct, or at
24  least when they arrived at their last job?
25      A. Yes.

Page 17

1       Q. Did you keep a record of that, or was the only
2   record on that paperwork that you received?
3       A. No. It was not on the paperwork. I did not
4   keep track of it.
5       Q. What would happen when a technician -- what
6   were you required to do when it became apparent by the
7   paperwork that a technician arrived to a job late?
8       A. Nothing. We would just be charged back from
9   Comcast.
10      Q. So you had ten other things that you checked,
11  okay. What were they?
12      A. Okay. I had to make sure that all the jobs are
13  from the same date. I have to make sure that all jobs
14  have customer signature. I have to make sure tags and
15  ground codes were completed.
16      Q. What's a tag and a ground code?
17      A. Each house has a line for Comcast that goes
18  into the house, and that line has to be tagged for --
19  I'm not sure for what exactly -- and ground.
20      Q. So what else?
21      A. Completion codes.
22      Q. What's a completion code?
23      A. It's the codes -- what type of job the
24  technician did has a certain code that it's going to be
25  the one that's going to be charged to Comcast.

5 (Pages 14 to 17)

Page 18

1    Q.  Would the completion code tell us whether it
2  was a long job or a short job?
3    A.  Not really because sometimes a video reconnect,
4  for example -- when you go to a customer's house, and
5  it's a video reconnect, a technician's going to install
6  just video services for the customer, but if the
7  customer has never had service, it would take longer.
8  If the customer had service before, it would take
9  15 minutes.  So it depends on the job -- on the house,
10 actually.
11   Q.  So in general, the long jobs were new
12 connections, and the short jobs were --
13   A.  Video change of services.
14   Q.  Right.
15   A.  Right.  In general, yes.
16   Q.  Would that show up on the paperwork whether it
17 was a new connection or --
18   A.  Yes.
19   Q.  So you could look at the paperwork and
20 determine whether it was a long job or a short job?
21   A.  Yes.
22   Q.  Ground completion codes, what else?
23   A.  Technician signature, and I had to make sure
24 that all the jobs that were assigned to the specific
25 technician were returned, either they were completed or

Page 19

1  not.  Check if any additional charges to customer have
2  been added to the customer's account, and that's it.
3    Q.  So those are the ten things that you checked on
4  that?
5    A.  Yeah.  I'm not sure how many exactly there
6  were.
7    Q.  And that was the paperwork?
8    A.  Yes.
9    Q.  What else did you do?
10   A.  Paperwork, and then based on that paperwork, I
11 would have a separate copy of -- that paperwork has
12 white and yellow -- has actually four copies.  One's a
13 white that has to be returned to Comcast.  The second
14 one is a yellow and that's the one we do the invoicing
15 and billing and payroll from.  The pink copy goes to the
16 customer, and the gold copy goes to quality control.
17     So the check in was -- I never saw the pink
18 copies because they stay with the customers at the
19 house.  The white copies I would check and send to
20 Comcast for check in.  The yellows are the ones that I
21 do the billing for, and then I put the gold ones on the
22 side for the supervisors to do quality control.  So
23 after I was done with the check in, I would go for the
24 billing.
25   Q.  What else would you do?

Page 20

1    A.  Separate the gold copies and route them by zip
2  code to the supervisors to do quality control.
3    Q.  Well, we got that.  This is fine.
4    A.  Okay.
5    Q.  But did you have any other job duties outside
6  of taking care of the white, yellow, the pink and gold?
7    A.  The billing that's related to it, and then the
8  payroll.  They're all linked.
9    Q.  So let's start with the billing.
10   A.  Uh-huh.
11   Q.  Billing was the yellow copy, and you're saying
12 that's related to payroll?
13   A.  Yes.
14   Q.  What would you do with the yellow copy that was
15 related to billing?
16   A.  I would have the billing completed and entered
17 into a file on my computer.
18   Q.  What do you mean by "billing"?  How would you
19 bill them, the clients?
20   A.  Well, the yellow copies, they are all combined
21 together at a cover sheet, a billing cover sheet that
22 the technician had to complete, and as I told you, the
23 completion codes are the ones that I bill for.  For
24 example, so if he has six routes -- six jobs, he does
25 two video reconnects, two video change of services, I

Page 21

1  would enter on my file that he did two video reconnects
2  and two video change of services, and that is put on an
3  Excel spreadsheet into an invoice and into the payroll
4  as well.
5    Q.  Would the technician be paid per completion
6  code?
7    A.  Yes.
8    Q.  Was he paid or she paid a certain amount of
9  money per completion code; in other words, if it said
10 video reconnect, was he paid a flat fee for a video
11 reconnect?
12   A.  Yes.
13   Q.  Can you remember or do you recall what the
14 technician was paid for per different types of
15 completion codes?
16   A.  Amounts?
17   Q.  Yeah.
18   A.  There's like 40 different codes.
19   Q.  40 different codes?
20   A.  Yes.  I know some of them, but not all.
21   Q.  So the technician was paid per piece, per code?
22   A.  Yes.
23   Q.  Who would pay the technician?
24   A.  There was -- it was Steven.  Most of the time,
25 when -- in the beginning, they were all contractors, and

Page 22

1  we made the checks inside the company.  After about six
2  months, we started using a payroll company, and they do
3  the payroll now.  They process the payroll.
4      Q.  In the beginning, they were all contractors?
5  When was that?
6      A.  August until --
7      Q.  Is that August of what year?
8      A.  2005.
9      Q.  Until when?
10     A.  Until April of 2006.
11     Q.  What happened in April of 2006, to the best of
12  your knowledge?
13     A.  Everybody became W-4 employees.
14     MR. DAL BON:  Why don't we take a ten-minute
15  break?
16     (Recess taken.)
17     (At this time, MR. CHEN leaves the deposition
18  proceedings.)
19  BY MR. DAL BON:
20     Q.  So there were 40 different codes?
21     A.  That's an estimate.  I forgot to tell you.
22     Q.  An estimate?
23     A.  Yes.
24     Q.  And the technicians were paid per code?
25     A.  Yes.

Page 23

1      Q.  Did you determine how much they were paid per
2  code?
3      A.  No.
4      Q.  Were you given like a formula to know how much
5  to pay them per code; in other words, did you have a
6  sheet with the codes on it --
7      A.  Uh-huh, yes.
8      Q.  -- and how much they were to be paid per code?
9      A.  Yes.
10     MR. CARLSON:  I'm just going to object to this
11  line of questioning as irrelevant and not calculated to
12  lead to the discovery of admissible evidence.
13     MR. DAL BON:  Well, I would say that the sheet
14  is admissible evidence if they were working per piece,
15  which apparently they were, okay?
16     MR. CARLSON:  What difference does that make to
17  your client?
18     MR. DAL BON:  Well, I want to take a look at
19  the codes.  I think I want to see the codes and how
20  much --
21     MR. CARLSON:  Why?
22     MR. DAL BON:  Because he was paid per code.
23     MR. CARLSON:  Who was?
24     MR. DAL BON:  My client.
25     MR. CARLSON:  No, he wasn't.  He was paid

Page 24

1  salary.  He was paid as a field supervisor.
2      MR. DAL BON:  Okay.  All right.  Well, let's go
3  on.
4      MR. CARLSON:  Why don't you get to what was
5  going on with your client?
6      MR. DAL BON:  Well, I want to find out what she
7  knows about payroll.  So this is what we're doing.
8  We're finding out what she knows about payroll, and she
9  is telling me, okay?
10     MR. CARLSON:  If you continue to go into things
11  that are not irrelevant, I'm going to instruct her not
12  to answer.
13     MR. DAL BON:  Okay.  You certainly have that
14  right.
15     MR. CARLSON:  Why don't you ask what things
16  pertain to your client?  These are employees that aren't
17  in the same position as your client.
18     MR. DAL BON:  Okay.  Well, I still need to
19  know.
20     Q.  Besides the invoicing and the flat fee and
21  those types of calculations, what else did you do in
22  your capacity as an office assistant?
23     A.  So that's what I did:  Check in, technician's
24  billing, company's invoicing and payroll.
25     Q.  Anything else?

Page 25

1      A.  Oh, I kept the personnel files updated.
2      Q.  Who?
3      A.  Who what?
4      Q.  The personnel files of who updated.
5      A.  Of the employees.
6      Q.  All the employees?
7      A.  Yes.
8      Q.  How many employees did the company have about?
9      A.  At what period of time?
10     Q.  The period of time that you kept their
11  personnel files?
12     A.  I still do.  From when we started in -- when I
13  started in September, we had about 30 employees.  Today
14  we have 115.
15     Q.  Then in July 2006, you started the new job; is
16  that correct?
17     A.  July of 2006, I quit.
18     Q.  Oh, you quit?  Okay.  Then you came back to
19  work in November of 2006?
20     A.  Yes.
21     Q.  Refresh my memory, what did you come back as?
22     A.  As payroll supervisor.
23     Q.  What were your job duties as payroll
24  supervisor?
25     A.  Same as before, but I did not do check in part.

1  We have check in people that do that.  I did all the
2  billing and all the invoicing and all the payroll.
3      Q.  Billing, so everything the same, invoicing and
4  what, payroll?
5      A.  And payroll.  Except the check in, I don't --
6  well, I supervise check-ins because we have different
7  people doing it now, but I don't personally do it every
8  day -- on a daily basis.
9      Q.  And you did that job until when?
10     A.  Payroll supervisor?
11     Q.  Yeah.
12     A.  Until --
13     Q.  Recently, right?
14     A.  Yeah, April 2007.
15        (Simultaneous speakers.)
16  BY MR. DAL BON:
17     Q.  What do you do for the company now?  Refresh my
18  memory.
19     A.  I still do that, but I also -- well, I just got
20  promoted to manager, but I am supposed to be doing all
21  of the company's finance managing.  I haven't got
22  started, yet, but I do have the title.
23     Q.  So you haven't started the finance managing?
24     A.  Not yet, no.
25     Q.  So are you still essentially doing the same

1  thing you did as payroll supervisor?
2      A.  Uh-huh.
3      Q.  But they've changed your title and --
4      A.  Yeah.
5      Q.  -- you're making more money.  I don't need to
6  know how much.  But you haven't moved on to new duties?
7      A.  I haven't, no, not completely.
8      Q.  When did you graduate -- did you graduate from
9  college?
10     A.  I am from Brazil.  I graduated from the
11  university there.
12     Q.  Sao Paulo?
13     A.  No.  In Rio.
14     Q.  I have relatives in Sao Paulo.
15        What University in Brazil did you graduate
16  from?
17     A.  It's called Federal University of Rio de
18  Janeiro.
19     Q.  When did you graduate?
20     A.  2000.  In July of 2000.
21     Q.  What did you graduate in?
22     A.  Law school.
23     Q.  Now, in Brazil, is that an undergraduate
24  education, or was it a graduate education?
25     A.  No.  It's a graduate.

1      Q.  So how long did you spend in graduate school?
2      A.  Five years.
3      Q.  Did you spend any time -- did you have an
4  undergraduate education, too?
5      A.  No.  In Brazil, it's different.  You go from
6  high school straight into university.  There is no such
7  thing as college as there is here.  You just go from
8  high school straight into a university.
9      Q.  Well, you do that here too.  But as opposed to a
10  four-year degree, it's a five-year degree.
11     A.  Yes.  And law school is always a five-year
12  degree.
13     Q.  In law school, did you take any accounting
14  courses or bookkeeping courses?
15     A.  No.
16     Q.  Did you take any finance courses?
17     A.  No.
18     Q.  Solely civil code?
19     A.  Yes.
20     Q.  It's not common-law there.  You graduated in
21  2000.
22        When did you immigrate to the United States?
23     A.  2001.
24     Q.  So did you work between 2000 and 2001?
25     A.  No.  In Brazil, no.  I worked as an intern.

1      Q.  Where?
2      A.  In Brazil.
3      Q.  Intern where?
4      A.  At the bank, a financial bank.  It's called
5  Development Bank of Brazil.  I also worked for -- I
6  don't know how that would be called here, but it's a
7  government institution, and it's pretty much like the DA
8  here.
9      Q.  District attorney?
10     A.  Yes.
11     Q.  So did you work with numbers at the Development
12  Bank of Brazil?  Did you do any accounting, any --
13     A.  Not accounting.  We worked -- in Brazil I
14  worked with contracts, but they were contracts of bond
15  issuing titles.
16     Q.  So you did work with some numbers?
17     A.  Yes.
18     Q.  Was it simple addition and subtraction, or was
19  it multiplication, any kind of --
20     A.  Well, I didn't really work with the numbers.  I
21  worked with the contracts.
22        (Simultaneous speakers.)
23  BY MR. DAL BON:
24     Q.  When you came to the United States, what was
25  your first job here?

Page 30

1    A. I worked at a restaurant.
2    Q. Which one?
3    A. It's called Mr. Pizza Man in Hayward.
4    Q. What did you do there?
5    A. I was a waitress.
6    Q. How long did you do that?
7    A. I did that for about nine months.
8    Q. From when to when?
9    A. From February of 2001 until October of 2001,
10   and then I went back to Brazil.
11   Q. How long did you spend in Brazil?
12   A. Three months. I went in October, and I came
13   back to the U.S. on January -- well, it was
14   December 31st of 2001.
15   Q. Then did you get another job here?
16   A. I worked for the same pizza place, but in a
17   different branch, and as a manager.
18   Q. Manager?
19   A. Uh-huh.
20   Q. Did you do payroll there?
21   A. Yes.
22   Q. Were there hourly employees there?
23   A. Yes.
24   Q. Did you have to pay them overtime?
25   A. Yes.

Page 31

1    Q. What was your understanding of your requirement
2    to pay them overtime?
3    A. Either more than eight hours a day or more than
4    40 hours a week or the seventh day in a row.
5    Q. How long did you work as pizza manager?
6    A. It was January of 2002 until August of 2004.
7    So it's about two and a half years.
8    Q. That looks like we're running up against this
9    job, right, almost?
10   A. No.
11   Q. Where did you go next?
12   A. I had a baby, and I didn't work for a year.
13   Q. So then we're in July of 2005?
14   A. That I started working in Nth Connect?
15   Q. Yeah.
16   A. September 2005.
17   Q. So is that your first job after the baby?
18   A. Yes.
19   Q. So now we've got your work history, your work
20   date.
21   Do you know the plaintiff in this case,
22   Paulo Aranda?
23   A. Yes.
24   Q. How do you know him?
25   A. I knew him before either one of us worked with

Page 32

1    Nth Connect. I was -- we were acquaintances. I was
2    friends with his wife.
3    Q. Did you go out? Did you -- does your -- you
4    and your husband, do they both know Paola and -- I
5    mean --
6    A. Paulo?
7    Q. I'm sorry. I know a Paola.
8    Did they both know Paulo?
9    A. Yes.
10   Q. You both knew Paulo?
11   A. Yes.
12   Q. Did you go out with him on social occasions?
13   A. Yes.
14   Q. I don't really care, and I'm not going to get
15   too deep into it.
16   What type of social events would you guys go
17   out on?
18   A. Kids' birthdays. They have two kids. They
19   have two girls. Friends, pretty much just birthdays,
20   and we spent Christmas together once. They spent New
21   Year's in my house once. That type of thing.
22   Q. Do you still go out with him on social events?
23   A. No. We don't go out anymore. But only my
24   husband keeps in contact with him.
25   Q. Is that because of the lawsuit?

Page 33

1    A. No.
2    Q. And again, it doesn't bear much relevance, but
3    why don't you go out with him anymore?
4    A. Because we were -- basically, she was a friend
5    of a friend of mine, and this friend of mine is not in
6    the country anymore. So we lost contact.
7    Q. What's that friend's name, by the way?
8    A. Margarita.
9    Q. Does she have a last name?
10   A. I believe -- I'm not sure. I believe it's
11   Silva.
12   Q. Is she Brazilian?
13   A. Yes, she is.
14   Q. So how did you know -- did you know Paulo when
15   he worked at Nth Connect?
16   A. Yes.
17   Q. I'm no longer concerned about your social
18   acquaintance with him. I want to know about your
19   business acquaintance now, okay?
20   A. Uh-huh.
21   Q. Did you have any reason to deal with him at Nth
22   Connect in your job?
23   A. Yes.
24   Q. Why?
25   A. I did payroll. And as I told you, I would

Page 34

1  route quality control, and it was one of his duties to
2  do quality control.  And because I did check in, and I
3  checked technician's paperwork, and those technicians
4  were under his supervisor, and so if I had any problems
5  with the technician, I would talk to him so that he
6  would get it fixed.  I did not deal with the
7  technicians.
8      Q.  What was your understanding of Paulo's job
9  there?
10     A.  He was a field supervisor.
11     Q.  What did that mean, or did you know?
12     A.  It means we have technicians, and we have
13 supervisors, and the supervisors have the technicians
14 under their responsibility on quality control,
15 equipment, job.  For example, if a technician doesn't
16 know how to do a job, but we still need to get it done,
17 we send it to the supervisor, and the supervisor will do
18 it.  So he did some of the technician's work on occasion
19 if they couldn't do it.  And he did -- I think I said
20 already -- quality control.
21     Q.  So it was your understanding that the
22 supervisors would sometimes go out and actually do the
23 technician's job?
24     A.  Yes.  They'd do what we call go backs.  If the
25 technician goes to a customer's house, and for some

Page 35

1  reason, there's something that he cannot do, then the
2  supervisor goes and finishes it, or if the customer has
3  any complaints about the technician, the supervisor goes
4  there and takes care of the customer.
5      Q.  Was the supervisor out in the field; in other
6  words, was he going from job to job every day, or was he
7  inside the building?
8      A.  Not necessarily.  They had their duties, and if
9  they had to go back to a job, they would, but if they
10 didn't, they don't have to.
11     Q.  Where, in general, would Paulo be?
12     A.  Well, he would go -- I don't know exactly his
13 schedule, but he would go in the office in the morning,
14 he would assign the jobs to the technicians, which it's
15 called routing.  He would help issuing equipment to the
16 technicians that the technicians need to complete the
17 jobs.
18     Q.  So he would route?
19     A.  Uh-huh.
20     Q.  Now, when you say help with equipment, would he
21 go get the equipment for them; is that your
22 understanding?
23     A.  I don't know if he went to get equipment.
24     Q.  Would he assign who got what equipment; is that
25 the deal?

Page 36

1      A.  I don't remember at that time because right now
2  we have people that do that.  I do not remember at that
3  time if he was the one that did it, or we had somebody
4  already to do that.  I think that occasionally -- I'm
5  not sure if it was every day, but yes, occasionally he
6  did.
7          MR. CARLSON:  I would just caution the witness,
8  if you don't know, you don't know is --
9          THE WITNESS:  Yeah.  I'm not sure.
10         MR. CARLSON:  -- the appropriate response.
11         THE WITNESS:  Okay.
12         (Simultaneous speakers.)
13 BY MR. DAL BON:
14     Q.  But you said occasionally he would go and help
15 with the equipment?
16     A.  What do you mean by help with the equipment?
17     Q.  Help load it, lift it.
18     A.  I believe so, yes.
19     Q.  Was Paulo in the same building with you?
20     A.  Yes.
21     Q.  Was he in the same office?
22     A.  Yes.
23     Q.  Did you see him?
24     A.  Uh-huh, yes.
25     Q.  What kind of an office do you work in?  Does

Page 37

1  everybody have closed-door offices, or is it the type
2  with the dividers?
3      A.  I worked in a closed office, and Paulo worked
4  on a -- outside on a divider with the other supervisors.
5  We had two at that time.
6      Q.  Where was his office in relation to yours?
7      A.  It was the next one.
8      Q.  What do you mean by next one?
9      A.  Well, my office was here, and my office had a
10 door, and the next one was open, and they had the
11 dividers there for the two supervisors, and then back
12 there was the warehouse, so mine and his.
13     Q.  When you closed the door, could you see out
14 into the office building?
15     A.  I worked with open doors.
16     Q.  But when you closed it, could you see out into
17 the office building?
18     A.  No.
19     Q.  So you didn't have a window out into the office
20 building?
21     A.  No, I don't.
22     Q.  Did Paulo work behind a divider?
23     A.  There wasn't a divider.  It was like a table
24 that would go around, and he had his desk here, and the
25 other supervisor had his desk there so there wasn't.

Page 38

1    Q. Could you see them through the open door?
2    A. Well, my door was here. I would have to go
3 into the walkway and see them.
4    Q. So you couldn't see them from the open door?
5    A. No.
6    Q. Did you spend most of your time in the office?
7    A. When I was doing check in in the morning and
8 that usually took me two hours, I was sitting on a big
9 table that is in --
10    Q. That's not what I asked you. Listen to my
11 question.
12        Did you spend most of your day inside your
13 office?
14    A. Yes.
15    Q. How many hours a day did you work?
16    A. Six, seven.
17    Q. From when to when?
18    A. Monday through Friday.
19    Q. What time would you get in in the morning, and
20 what time would you leave in the afternoon?
21    A. 9:30, and I get off at 4:30, 5:00.
22    Q. 1:30 in the afternoon?
23    A. No, 9:30 to 4:30.
24    Q. Oh, okay. Did you have a break for lunch?
25    A. Yes.

Page 39

1    Q. How long was your break?
2    A. It's up to me either half an hour or one hour.
3    Q. So that's six and a half to -- six hours a day;
4 is that correct?
5    A. Yeah. Well, sometimes I would leave at 5:00.
6 That's why I'm saying between six and seven. I just had
7 to get my job done, and as soon as I got my job done,
8 and that was around that time 4:30 or 5:00, I left.
9    Q. Paid hourly or salary?
10    A. I was paid in the beginning hourly, and then
11 after -- I'm not sure, but I believe three months, I got
12 on salary.
13    Q. You say you spent the first two hours on a big
14 table?
15    A. Uh-huh.
16    Q. Could you see Paulo on the big table -- from
17 the big table?
18    A. Yeah.
19    Q. So from 9:30 to 11:30 you were out on the table
20 and --
21    A. Uh-huh.
22    Q. -- you could see Paulo?
23        Then was the rest of your day for the most part
24 spent in your office?
25    A. Yes.

Page 40

1    Q. Did you see Paulo in the building the majority
2 of the time that you were out on the floor from 9:30 to
3 11:30?
4    A. He wasn't in the building all day. He would be
5 in the building in the morning, and then he would leave
6 to do what he had to do on the field.
7    Q. So did you know Paulo from the time that you
8 started work there to the time you finished work there?
9    A. Yes.
10    Q. Did you do his paycheck and payroll?
11    A. Yes.
12    Q. What was your -- he was a field supervisor, and
13 what was your understanding as to how he was paid?
14    A. Salary, weekly.
15    Q. How was that salary calculated?
16    A. It was just a weekly salary.
17    Q. Of what?
18    A. In the beginning, from August until I believe
19 October of 2005, it was $900 a week, and then he got a
20 raise to 1200 a week, I believe, until January when
21 he --
22    Q. So that's from August 2005 to October of 2005?
23    A. Uh-huh.
24    Q. Then a raise to $1200 a week from when?
25    A. From October and on. That was -- because at

Page 41

1 that time he was full-time supervisor, he would work six
2 days a week at $200 a day. In January he --
3    Q. Hold on. I'm a little confused now.
4    A. Uh-huh.
5    Q. Are you saying from August to October of
6 2005 --
7    A. Uh-huh.
8    Q. -- he was working six days a week?
9    A. Yes.
10    Q. At 200 --
11    A. No. Not on the beginning. I'm talking about
12 the 1200.
13    Q. At the beginning, was he being paid daily?
14        (Simultaneous speakers.)
15        MR. DAL BON: Hold on.
16        MR. CARLSON: Objection; asked and answered.
17        MR. DAL BON: No --
18        MR. CARLSON: Yeah.
19        MR. DAL BON: -- I didn't ask that.
20        MR. CARLSON: Yeah, you did. But she said he
21 was paid weekly, 900 a week. You can read it back if
22 you want.
23        MR. DAL BON: I'm asking her a different
24 question now.
25    Q. From August of 2005 to October of 2005, was he

Page 42

1  paid daily?
2      A.  No.  It was $900 a week for six days a week.
3      Q.  So your understanding was that he was expected
4  to show up to the job six days a week for $900 a week?
5      A.  Yes.
6      Q.  What would happen if he didn't show up?  What
7  happened if he only worked five days?
8      A.  He would still get the $900.
9      Q.  You're sure about that?
10     A.  I'm not sure.  I don't -- I didn't work in the
11 beginning -- when I started working there, right after
12 that, they got the 1200 a week.
13     Q.  So you started working there when he was making
14 1200 a week?
15     A.  Right after I started.
16     Q.  Right.  How soon after you started?
17     A.  About a month so that's one or two pay periods.
18     Q.  Do you know who was doing his checks before
19 you?
20     A.  No.
21     Q.  Who trained you?
22     A.  Steven.
23     Q.  Is he the owner of the company?
24     A.  Yes.
25     Q.  So in October of 2005, he was paid $200 a day

Page 43

1  six days a week, correct?
2      A.  Uh-huh.
3      Q.  How long did that last to the best of your
4  knowledge?
5          MR. CARLSON:  I'm going to object as
6  mischaracterizes the testimony.  She testified he was
7  paid 1200 a week.
8          MR. DAL BON:  No.  She said $200 a day at six
9  days a week.
10         MR. CARLSON:  She said that's the way it was
11 calculated.
12         THE WITNESS:  That's the way it was calculated.
13 Just to explain to you what comes on later because he
14 became a part-time supervisor, and his salary was
15 lowered because he was working less days when he was --
16         MR. DAL BON:  Can you read back her testimony
17 pertaining to this?
18         (The record was read as follows by the
19 Reporter:
20         "Q.  How was that salary calculated?
21         "A.  It was just a weekly salary.
22         "Q.  Of what?
23         "A.  In the beginning, from August until
24             I believe October of 2005, it was
25             $900 a week, and then he got a

Page 44

1              raise to 1200 a week, I believe,
2              until January when he --
3          "Q.  So that's from August 2005 to
4              October of 2005?
5          "A.  Uh-huh.
6          "Q.  Then a raise to $1200 a week from
7              when?
8          "A.  From October and on.  That was --
9              because at that time he was
10             full-time supervisor, he would work
11             six days a week at $200 a day.  In
12             January he --
13         "Q.  Hold on.  I'm a little confused
14             now.")
15 BY MR. DAL BON:
16     Q.  So to the best of your knowledge, how long was
17 he working making 1200 a week?
18     A.  Until January of 2006.
19     Q.  What happened in January 2006?
20     A.  The workload dropped.  He became a part-time
21 supervisor.
22     Q.  What was he being paid then?
23     A.  I don't remember.
24     Q.  Were you still responsible for his payroll?
25     A.  Yes.

Page 45

1      Q.  So you don't remember the rate that he was paid
2  at?
3      A.  (Witness shakes head.)
4      Q.  Who would tell you -- who told you how much to
5  pay him?
6      A.  He had a manager, Guilherme.
7      Q.  What's Guilherme's full name?
8      A.  The first name is G-U-I-L-H-E-R-M-E; last name,
9  Elias, E-L-I-A-S.  And Steven, he's the owner.
10     Q.  Who told you at what rate Mr. Aranda was to be
11 paid at?
12     A.  Steven.
13     Q.  How much training did you receive on doing the
14 payroll from Steven?
15     A.  A week.
16     Q.  Did you actually write the checks?
17     A.  No.
18     Q.  Who wrote the checks to the best of your
19 knowledge?
20     A.  Steven, and he had an assistant called Eddie.
21 It was either one.
22     Q.  So would you provide the amounts?
23     A.  Yes.
24     Q.  Would you calculate the amounts?
25     A.  Yes, for --

Page 46

1    Q. For Mr. Aranda?
2    A. No. He was supervisor. He had a flat rate.
3    Q. But did you calculate how much he was supposed
4    to be paid?
5    A. Yes. I sent the calculations.
6    Q. Did you take out taxes?
7    A. Until April of 2006, no. They were 1099.
8    Q. After April of 2006, did you deduct taxes?
9    A. The payroll company does. I just give the
10   gross amount.
11   Q. So before April of 2006, there were no
12   deductions for taxes?
13   A. No.
14   Q. Do you know why?
15   A. They were 1099.
16   MR. DAL BON: One second. I'll be right back.
17   We can go off the record.
18   (Recess taken.)
19   MR. DAL BON: I'm going to show this to your
20   attorney first. Mark this as Plaintiff's Exhibit A.
21   (Plaintiff's Exhibit A was marked for
22   identification.)
23   BY MR. DAL BON:
24   Q. Do you recognize this document?
25   A. It is probably a printout of the paperwork.

Page 47

1    Q. Printout of what?
2    A. The QuickBooks.
3    Q. The QuickBooks? Is that how payroll was kept
4    on QuickBooks?
5    A. Yes.
6    Q. Do you know how to use QuickBooks?
7    A. No.
8    Q. So you would not input this data into
9    QuickBooks?
10   A. No.
11   Q. Who would you give the amount to before you
12   gave it to the payroll service?
13   A. Well, when they were 1099 --
14   Q. Yeah.
15   A. -- which was from August until April, it was
16   just Steven. We didn't have a payroll service company.
17   He would do it.
18   Q. August to April of 2006?
19   A. 2006, he would do it out of the QuickBooks.
20   Q. And you started there in?
21   A. With the company?
22   Q. Yeah, September of 2005?
23   A. Yes. Can I go back on this? This is
24   probably -- I'm not sure what this is. This is probably
25   just the bank reconciliation. I'm not sure what this

Page 48

1    is.
2    Q. The bank reconciliation?
3    A. Yeah.
4    MR. CARLSON: Is that an estimate or a guess?
5    THE WITNESS: It's a guess.
6    MR. CARLSON: Okay. Let's not guess. Your
7    answer is, you don't know what it is.
8    THE WITNESS: Yeah. Okay. Yeah, then that's
9    that. Sorry about that.
10   MR. DAL BON: I'm going to show your attorney
11   this.
12   MR. CARLSON: Exhibit B?
13   MR. DAL BON: Yes.
14   (Plaintiff's Exhibit B was marked for
15   identification.)
16   BY MR. DAL BON:
17   Q. It's dated December 14, 2005 -- which number is
18   it?
19   A. December 14th.
20   Q. So looking at the top of Exhibit A, okay, top
21   column says: 12/14/2005; and it has a number 3871;
22   Paulo Aranda; incentives; Union Bank of California;
23   incentive; and it says minus $2,100. And then if you
24   look at Plaintiff's Exhibit B, it appears to be a check
25   written out to Paulo Aranda on 12/14/2005, and the check

Page 49

1    number 3871 matches the number that was placed into
2    Exhibit A, and it is for $2,100, and you were working on
3    December 14th of 2005 for Nth Connect; is that correct?
4    A. Yes.
5    Q. And you were working as the office assistant;
6    is that correct?
7    A. Yes.
8    Q. And did you said earlier that you were
9    responsible for giving payroll or Mr. Chen in this case
10   how much Paulo was to be paid; is that correct?
11   A. Yes.
12   Q. Do you recall how you had come to this
13   calculation of $2,100?
14   A. Yes.
15   Q. How did you do that? Can you explain it to me?
16   A. He made $1200 a week, but Steven had bought a
17   car for him, and he was repaying Steven back $300 every
18   payroll. So it was 2400 for two weeks minus 300 for the
19   car payment.
20   Q. So this represents two weeks?
21   A. Uh-huh.
22   Q. At $2,400?
23   A. Uh-huh.
24   Q. Minus a $300 car payment?
25   A. Yes.

Page 50

1    MR. DAL BON:  I am going to go ahead and let
2  your attorney look at this one.
3    MR. CARLSON:  Exhibit C?
4    MR. DAL BON:  Yes.
5    (Plaintiff's Exhibit C was marked for
6  identification.)
7  BY MR. DAL BON:
8    Q.  This, like the previous check, looks like it
9  was a payroll check written to Paulo Aranda, and if you
10  look at the second column, it says:  12/01/2005; Paulo
11  Aranda; incentives; incentive; $1,700, for the second
12  column on Exhibit A, and it's check number 3819, and
13  this is check number 3819 for $1,700.
14    Did you calculate this check?
15    A.  Probably, yes.
16    Q.  Do you recall how you came to this calculation
17  of $1,700?
18    A.  It's an estimate.  I believe he had a cash
19  advance.  He always had cash advances.
20    Q.  So what kind of a cash advance would he have on
21  this check?
22    A.  It would be 400.
23    Q.  400?
24    A.  Yeah.
25    Q.  Does this represent a certain pay period?

Page 51

1    A.  Yes.
2    Q.  What is the pay period this represents?
3    A.  It says on the bottom 11/19 to 11/26.
4    Q.  So that would have been one week; is that
5  correct?
6    A.  No.  It's week ending 11/19 and week ending
7  11/26.  So it was the Sunday, the previous Sunday from
8  11/19.
9    Q.  So how many days does this represent?
10    A.  This is two weeks.
11    Q.  And that's 14 days?
12    A.  That's 14 days, yes.
13    Q.  You're saying that this represents his payment
14  for 14 days --
15    A.  Yes.
16    Q.  -- minus a $500 or $400 cash advance, correct?
17    A.  I am not sure about that, yes.  He was one of
18  the employees that had cash advances often.
19    MR. CARLSON:  And the car as well?
20    THE WITNESS:  And the car as well, yes.
21    MR. CARLSON:  So it's 700.
22    THE WITNESS:  Yeah, that's 400 for --
23  BY MR. DAL BON:
24    Q.  Well, let's start with the car.  Do you know
25  who kept a record of that?

Page 52

1    A.  Steven did.
2    Q.  Where are those records?
3    A.  I don't know.
4    Q.  Do you know whether Steven would pay him by
5  check or by cash?
6    MR. CARLSON:  I'm sorry.
7  BY MR. DAL BON:
8    Q.  For the car, you're saying he bought him a car,
9  right?
10    MR. CARLSON:  Do you know?
11    THE WITNESS:  No.  He bought a car.  That's all
12  I know.
13  BY MR. DAL BON:
14    Q.  Do you know whether he was paid -- whether
15  Mr. Aranda was paid by check or cash?
16    A.  Mr. Aranda?
17    Q.  Yeah.
18    A.  No.  Steven bought a car for Paulo.  He
19  financed a car for Paulo.  Paulo was repaying Steven for
20  the car.
21    Q.  So you're saying that it was your understanding
22  then that Steven bought the car out of what money?  Out
23  of Nth Connect money?
24    A.  I don't know.
25    MR. CARLSON:  Object as irrelevant but --

Page 53

1    MR. DAL BON:  No.  It is relevant.
2    MR. CARLSON:  -- go ahead.
3    MR. DAL BON:  This has to do with his pay.
4  There were deductions made to his pay.  This is
5  extremely relevant to the case.
6    MR. CARLSON:  Whatever agreement they had, they
7  had.
8    MR. DAL BON:  It is completely relevant.  It
9  has to do with his pay.
10    MR. CARLSON:  If she knows.
11    MR. DAL BON:  Well, that's what we're asking.
12    Q.  You're saying that in December 14th, 2005 the
13  $2,100 check represents his full pay minus $300 for a
14  car payment, okay?
15    A.  Yes.
16    Q.  It was your understanding that Steven Chen
17  bought my client a car and financed it?
18    A.  Yes.
19    Q.  Do you know -- you did the payroll, and this
20  certainly has two to do with how much this person makes
21  on payroll -- do you know how Mr. Chen paid for the car?
22  Whether he paid -- in other words, did he pay Paulo?
23  Did he give him a check for the car, or did he pay for
24  the car directly?
25    MR. CARLSON:  If you know.

Page 54

1    THE WITNESS: I don't know. I don't know.
2  BY MR. DAL BON:
3    Q. You don't know. Do you remember who told you
4  to take $300 out of the check?
5    A. Steven did.
6    Q. Did he show you any documents?
7    A. No.
8    Q. He just said take $300 out of this check?
9    A. Yes.
10   Q. Let's go now to the cash advance that's
11 December 1st of 2005, okay. You're saying that
12 Mr. Paulo was one of those employees who would get cash
13 advances.
14      So you did payroll and this cash advance is
15 being taken against his payroll. Do you know how he
16 would get the cash advance?
17   A. From Steven, a check from Steven.
18   Q. So Steven would write him a check?
19   A. Yes.
20   Q. In his name? In Paulo's name?
21   A. Paulo's name.
22   Q. Do you know whether that check would come out
23 of Nth Connect Telecom?
24   A. Yes, it would.
25   Q. Would you be the one that would fill the check

Page 55

1  out for him?
2    A. No.
3    Q. So how did you know that Steven had written a
4  check for Paulo and to deduct, you said, $400 from his
5  pay on December 1st, 2005?
6    A. This check has two stubs -- one is for the
7  employee; one is for company record. The one that is
8  for company record would say at the top cash advance for
9  how much, date, payable in certain amount, in two
10 installments or one installment, and the employee would
11 sign on it.
12   Q. So the company should have a record of those
13 stubs, right?
14   A. Yes.
15   Q. If we asked for all documents relating to
16 payroll, those documents, those stubs, would relate to
17 payroll, correct?
18   A. Yes.
19   Q. Do you know whether the company -- do you know
20 where the company keeps those records?
21   A. The personnel files.
22   Q. In the personnel files?
23   A. Uh-huh.
24   Q. So this would be in Mr. Aranda's personnel
25 file?

Page 56

1    A. It should be, yes.
2    MR. DAL BON: So this is D.
3    MR. CARLSON: By the way, are you going to go
4  through every check?
5    MR. DAL BON: Possibly. Until I understand
6  exactly what is going on with these checks.
7    MR. CARLSON: Well, if you decide you are going
8  to do that, why don't you mark them all, and then you
9  can just fly through them. You don't have to mark each
10 individual one. Maybe the next Exhibit E should be the
11 rest of the checks.
12   MR. DAL BON: You want me -- can I do a group
13 exhibit? Is that all right with you?
14   MR. CARLSON: That's fine with me. Whatever
15 gets us through this quicker if that's what you're going
16 to do. If you're not going to ask about every check,
17 then there's no need for it.
18   MR. DAL BON: Here's D.
19   (Plaintiff's Exhibit D was marked for
20 identification.)
21 BY MR. DAL BON:
22   Q. This check is dated November 17th, 2005. It
23 looks like it's check number 3758.
24      Do you recall whether you calculated this
25 check?

Page 57

1    A. I don't remember every single check.
2    Q. I know. But I'm asking you about this
3  particular check.
4    A. I don't remember.
5    Q. You do not remember?
6    A. No.
7    Q. Does this also represent a pay period of two
8  weeks?
9    A. Yes.
10   Q. Was he making $1200 a week at that point?
11   A. Yes.
12   Q. So the check should have been -- if he was
13 making $1200 a week, it should have been for $2,400,
14 right?
15   A. (Witness nods head.)
16   Q. And you don't remember why you wrote this
17 particular check out for $1,800?
18   A. I don't remember.
19   Q. But there should be a record in his personnel
20 file or somewhere of the $600 deduction from the check,
21 correct?
22   A. Yes.
23   MR. DAL BON: Then why don't we mark these
24 Group Exhibit E.
25   (Plaintiff's Exhibit E was marked for

Page 58

1    identification.)
2  BY MR. DAL BON:
3       Q. Let's start with the top check on Group Exhibit
4  E. There's a Bate stamp number of NC0044, and it's
5  check number 34 -- looks like 3435, dated September 9th,
6  2005, and it is for $1,500.
7       Do you see that check?
8       A. Uh-huh.
9       Q. Does this cover another two-week time period?
10      A. I don't know. I wasn't working there, yet.
11      Q. You weren't working there, yet. Let's go to
12  the next check. This one is NC0045 and is dated
13  September 23, 2005.
14      Were you working there at that point?
15      A. Yes.
16      Q. Okay. And this check is for $1,800.
17      Does this, to the best of your knowledge, cover
18  a two-week period?
19      A. Yes.
20      Q. Would he have been making $900 a week during
21  that period?
22      A. Uh-huh.
23      Q. So this would have been a full paycheck?
24      A. Uh-huh.
25      Q. Let's go to the next one and that one is dated

Page 59

1  October 5, 2005, and it is for $1,300; is that correct?
2       A. Yes.
3       Q. Would this have been for a two-week period?
4       A. I don't know.
5       Q. You don't know. Do you recognize this
6  signature on these checks?
7       A. Uh-huh.
8       Q. Whose signature is that?
9       A. It's Steven's.
10      Q. But to the best of your recollection, in this
11  period, he was making, what, $900 a week?
12      A. I'm not sure. I don't know if he had a raise
13  already at this time.
14      Q. So this is 1300.
15      A. Uh-huh.
16      Q. Let's go to the next check, and that is
17  October 6th, 2005, and that says $500. And it says down
18  below week of 9/24 -- it looks like -- to 10/03/05. It
19  says cash advance, $500.
20      Would this be a cash advance?
21      A. Uh-huh.
22      Q. Let's go to the next check, and this one is --
23  this is 10/19/05.
24      Would that have been for a two-week period?
25      A. I don't know. There is no description at the

Page 60

1  bottom.
2       Q. This is for $2,300?
3       A. Yeah.
4       Q. Would he have been making $1200 a week by then?
5       A. I don't know. I know it was sometime in
6  October. I'm not sure of the date.
7       Q. Were you still being trained by Steven in
8  October of '05?
9       A. No.
10      Q. So you wrote this check on your -- you put the
11  calculations for this check on your own, correct?
12      A. I was told what calculation to put on his
13  check.
14      Q. Who were you told by?
15      A. By Steven because he had cash advances and the
16  car payments.
17      Q. So is it true that Steven would be the one to
18  make the calculations as to how much Mr. Aranda would
19  make?
20      A. Yes.
21      Q. Every two weeks?
22      A. Uh-huh.
23      Q. Is it true that really you didn't do the
24  calculations?
25      A. On supervisors, no. I did on technicians.

Page 61

1       Q. So it was Steven that did the calculations?
2       A. On supervisors, yes.
3       Q. Was he, Paulo, a supervisor?
4       A. Yes.
5       Q. So did Steven do all the calculations --
6       A. Yes.
7       Q. -- for these checks?
8       A. Uh-huh.
9       Q. Did he report to you how much you were to write
10  the checks out for?
11      A. He would -- yeah, he would send to me.
12      Q. How would he sends that to you?
13      A. He would either tell me, or he would put on the
14  file itself. We share the file, the payroll file.
15      Q. So in the payroll file, there should be some
16  notations; is that correct?
17      A. Yes.
18      Q. Okay. Written by Mr. Chen; is that correct?
19      A. Yes.
20      Q. Do you know whether they still have that
21  payroll file?
22      A. I don't know.
23      Q. Do you know where that payroll file would be
24  located?
25      A. In one of the company computers.

Page 62

1    Q. So would there be a paper record of it?
2    A. No.  It was made out of the computer.
3    Q. So would he put a notation in the company
4  computer?
5    A. Yes.
6    Q. Do you know what computer program he used to do
7  that?
8    A. Excel.
9    Q. So there is an Excel spreadsheet in the company
10  computer?
11    A. Uh-huh.
12    Q. When you say he would put a notation in the
13  file, you mean he would put a notation in the Excel
14  spreadsheet?
15    A. Yes.
16    Q. He wouldn't handwrite anything?
17    A. No.  Oh, I don't know, to be honest, if he
18  would handwrite.
19    Q. So then we have got another check on the next
20  page is Bates stamped 0049, and it is for $2,300.
21    Do you know how that calculation came about?
22    A. No.
23    Q. Let's move to the next check number NC0050, and
24  that is for $500, cash advance for weekend November 12,
25  2005.

Page 63

1    A. Uh-huh.
2    Q. Do you know how that check was calculated?
3    A. It was just a cash advance.
4    Q. And whose signature is that?
5    A. That is Steven's.
6    Q. And then we have the final page here NC0051?
7    A. I don't have it -- Oh, it's this one?
8    Q. Are we back to Exhibit A?
9    A. D.
10    MR. DAL BON:  Oh, Exhibit D.  We already went
11  over that.  Let's do another group exhibit.  I'm going
12  to hand this.  This will be Group Exhibit F.
13    (Plaintiff's Exhibit F was marked for
14    identification.)
15  BY MR. DAL BON:
16    Q. So now we're looking at Group Exhibit F, and
17  we're looking at the top of it, and there is a check
18  that is Bates stamped NC0055?
19    A. Uh-huh.
20    Q. Do you see that?
21    A. (Witness nods head.)
22    Q. Do you know whether Mr. Aranda was working part
23  time as of the date of this check, January 12th, 2006?
24    A. I believe so.
25    Q. And do you see the number here $568.75?

Page 64

1    A. Uh-huh.
2    Q. The date is January 12, 2006?
3    A. Uh-huh.
4    Q. Do you know how that check was calculated?
5    A. That's an estimate.  I believe he had some
6  field install work on this pay period because he was
7  doing part-time supervisor.  I'm not sure how many days
8  a week he worked as a supervisor.  The two or three days
9  that he had left, he would do installs.
10    Q. How was he paid when he worked part time?
11    A. I don't remember how many days he worked, but
12  he had a salary as well at that time for the days that
13  he worked as a supervisor.
14    Q. What was the salary?
15    A. I don't remember.
16    Q. When you say "salary," what do you mean by
17  salary?  Was it a daily salary?
18    A. No.  It was a fixed rate for the week.
19    Q. A fixed rate?
20    A. Yeah.  He would have some days of the week -- I
21  don't know what his schedule was -- that he worked as a
22  supervisor.  The rest of the days he would do installs.
23    Q. So when he went part time, he worked some days
24  of the week as a supervisor and other days of the week
25  as an installer?

Page 65

1    A. Yes.
2    Q. When he worked as an installer, was he paid
3  like the other installers were paid?
4    A. Yes.
5    Q. Was he paid per piece?
6    A. Yes.
7    Q. Was he paid per code?
8    A. Yes.
9    Q. So that is relevant to his pay?
10    A. Uh-huh.
11    Q. Then when he worked as a supervisor, he was
12  paid a salary?
13    A. Yes.
14    Q. Do you recall -- during this time period of
15  roughly around the time of January 12th, 2006, do you
16  recall how many days a week he was supposed to be
17  working as a supervisor?
18    A. No.  I'm not in charge of schedule.
19    Q. But you were in charge of payroll?
20    A. Yes.
21    Q. You were in charge of at least calculating his
22  payroll --
23    A. Yes.
24    Q. -- as it pertains to the piece work?
25    A. Uh-huh.

Page 66

1    Q.  Then adding it onto the salary?
2    A.  Uh-huh.
3    Q.  You're saying you can't remember how much the
4   salary was?
5    A.  No.  I don't remember.
6    Q.  But the piece work was per --
7    A.  Per job.
8    Q.  -- per job?
9       And would there be a record --
10   A.  Yes.
11   Q.  -- of that piece work?
12   A.  Uh-huh.
13   Q.  Do you know whether they have a record of that
14  right now?
15   A.  It's the same file.  The Excel spreadsheet for
16  the payroll, it's all one file.
17   Q.  It's all one file.  It's all in that Excel
18  spreadsheet?
19   A.  Yes.
20   Q.  So if we requested payroll records, we should
21  get a copy of that Excel spreadsheet?
22   A.  Yes.
23   Q.  That would tell us really how much he was being
24  paid; is that correct?
25   A.  Yes.

Page 67

1    MR. CARLSON:  Well, the check will tell you how
2   much he was being paid as well.  I mean, you're
3   saying for getting --
4    THE WITNESS:  Detail.
5    MR. CARLSON:  -- other detail other than
6   this --
7    MR. DAL BON:  No.  This isn't telling me
8   anything.
9    MR. CARLSON:  You said it would tell you how
10  much he's being paid, and this check tells you how much
11  he's being paid.
12   MR. DAL BON:  No, it doesn't.
13   MR. CARLSON:  It doesn't?
14   MR. DAL BON:  No.
15   MR. CARLSON:  It's an amount of money.  What
16  else was he paid?
17   MR. DAL BON:  But we don't know how they came
18  about that amount?
19   MR. CARLSON:  Then you're asking a different
20  question.  You're asking a question of you want
21  something that shows a description of a breakdown.
22   MR. DAL BON:  But based on this check, okay,
23  she's saying he possibly got cash advances; she's saying
24  he possibly -- the owner was paying for his car.  So we
25  don't really know, based on this check, how much he was

Page 68

1   being paid.
2    MR. CARLSON:  Based on this check.
3    MR. DAL BON:  Yeah.  Based on any of these
4   checks --
5    MR. CARLSON:  That's not correct.
6    MR. DAL BON:  -- well, very few of them.  We
7   need the Excel spreadsheet to see how much he was being
8   paid if those --
9    MR. CARLSON:  I'm happy to talk to my client
10  and see what he has.
11   MR. DAL BON:  -- if those deductions were being
12  taken out of these checks.
13  BY MR. DAL BON:
14   Q.  To the best of your knowledge because you were
15  calculating the salary of Mr. Aranda during this period,
16  how many days a week did he work as a supervisor?
17   A.  I don't know.
18   Q.  Do you remember whether it was a fixed number
19  of days?
20   A.  Yes.
21   Q.  So it wouldn't fluctuate from week to week?
22   A.  I don't think so.  I'm not sure.
23   Q.  You're not sure?
24   A.  As I told you, I didn't do his schedule.
25   Q.  Who did his schedule?

Page 69

1    A.  His manager.
2    Q.  That was who?
3    A.  Guilherme.
4    Q.  So if we deposed Guilherme, he would be able to
5   tell me that to the best of your knowledge?
6    A.  I don't know.  You would have to ask him.
7    Q.  But he did the schedule?
8    A.  Yes, he did.
9    Q.  So he would know doing the schedule?
10   A.  I believe so.  I believe so.
11   Q.  So was it your understanding that Mr. Aranda
12  got paid a fixed rate for a fixed number of days a week
13  during this period?
14   A.  Yes.
15   Q.  It was Mr. Chen who told you how much to pay
16  him at the fixed rate?
17   A.  Yeah.  At a fixed rate, yes.
18   Q.  How long did that go on for?
19   A.  I believe two or three months.
20   Q.  From when to when?
21   A.  January of 2006 until March of 2006.
22   Q.  So let's look at the next check.
23   THE WITNESS:  Can I use the restroom real
24  quick, please?
25   MR. DAL BON:  Absolutely.

1          (Luncheon recess taken:  12:02 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          AFTERNOON SESSION

2             (1:22 p.m.)

3       (Plaintiff's Exhibit G was marked for

4  identification.)

5       MR. DAL BON:  Can you repeat back the last

6  question?

7       (The record was read back as follows by the

8  Reporter:

9       "Q.  How long did that go on for?

10      "A.  I believe two or three months.

11      "Q.  From when to when?

12      "A.  January of 2006 until March of

13        2006.

14      "Q.  So let's look at the next check.")

15  BY MR. DAL BON:

16       Q.  Looking at a Group Exhibit F, and we're two

17  pages in.  It says January 26th, 2006 that's the date on

18  the check.  It's Bates stamp number is NC0057, and it's

19  made out to Paulo Aranda, and the amount is 1968.

20      Do you know how that check was calculated?

21       A.  No, I don't.

22       Q.  Was that a period where he was working as a

23  manager and a piece worker?

24       A.  Supervisor, I believe so, yes.

25       Q.  Supervisor and a piece worker, right?

1       A.  Uh-huh.  Yes.

2       Q.  February 9th, 2006, it's the next page, and

3  NC0058, and that says $2,100?

4       A.  Uh-huh.

5       Q.  Do you know how that was calculated?

6       A.  This looks like a salary only.

7       Q.  Salary only?

8       A.  It looks like it.

9       Q.  Do you remember?

10      A.  I don't remember.

11      Q.  So was he making $2100 every two weeks during

12  that period?

13      A.  I don't remember.

14      Q.  Who would have given you the salary amount?

15      A.  Steven did.

16      Q.  Let's go to the next one?

17      A.  Uh-huh.

18      Q.  That is NC0059, February 23rd, 2006.  The check

19  is made out for $1,300?

20      A.  Uh-huh.

21      Q.  Do you know how that amount was combined?

22      A.  I don't remember.

23      Q.  Let's go to the next one.  And that is dated

24  March 9th, 2006, and that says $776.

25      Do you know whose signature that is in the

1  corner?

2       A.  That's Eddy Wang.

3       Q.  Eddy Wang, what is his position with the

4  company?

5       A.  He was Steven's assistant, I believe.

6       Q.  I take it he had the authorization to sign

7  checks?

8       A.  Yes, he did.

9       Q.  And this is for $776.  Do you know how that

10  check was calculated?

11      A.  No.  I don't remember.

12      Q.  We have March 9th, 2006, and it's for $200.

13      Do you know how that check was calculated?

14      A.  No.

15      Q.  Let's go to the next one.  Another one for

16  $200, dated March 10th.  We're at NC0062.

17      Do you know how that check was calculated?

18      A.  No.

19      Q.  Let's go to NC0063, March 23rd, 2006, and that

20  is for $327.25.

21      Do you know how that check was calculated?

22      A.  No.

23      MR. CARLSON:  Do you want to have her just look

24  through the rest of it, and we can --

25      MR. DAL BON:  No.  Let's go through them one by

Page 74

1    one.
2        MR. CARLSON:  Whatever.
3    BY MR. DAL BON:
4        Q.  Let's go to the next one, and this is
5    March 23rd, 2006, and this one is for $1250.
6        Do you know how that check was calculated?
7        A.  No.  I don't remember.
8        Q.  Do you know how he was being paid at that
9    point?
10       A.  I'm not sure.
11       MR. CARLSON:  I'm going to object as vague and
12   ambiguous as to the term "how he was being paid," the
13   phrase rather.
14       (Telephone interruption.)
15   BY MR. DAL BON:
16       Q.  On March 23rd, 2006, okay, do you recall
17   whether he was being paid a salary or whether he was
18   part time or a piece worker?
19       A.  He always had a salary.  I don't remember if he
20   was full time or part time still.  I don't remember.
21       Q.  April 6, 2006, this one is for $97.  Do you
22   know what that check was for?
23       A.  No.
24       Q.  Let's go to the next one, again, April 6, 2006,
25   this one is for $1600.

Page 75

1        Do you know what that check was for?
2        A.  This one, I believe, was for full-time
3    supervisor, $800 a week if I recall.
4        Q.  So did they change his rate of pay?
5        A.  No, no, no.  He wasn't full time.  He was still
6    part-time supervisor, but he didn't do piece work
7    anymore.  He was working a different system.
8        Q.  So he wasn't doing piece work by April of 2006?
9        A.  No.
10       Q.  What was he doing?
11       A.  He was a supervisor, but he was working at a
12   different system, and we did not have a full schedule
13   there.
14       Q.  So he was not working full time?
15       A.  No.
16       Q.  By "different system," what do you mean?
17       A.  I mean, he originally started working in South
18   Bay, which means San Jose.  At this time, I believe he
19   was already working in Richmond which is East Bay.
20       Q.  Do you know what his salary was at that time?
21       A.  I'm not sure.  Maybe --
22       Q.  Do you know how -- go ahead.
23       A.  -- 800 a week or $850 a week, either one.
24       Q.  Do you know how many days a week he worked?
25       A.  No.

Page 76

1        Q.  Do you know whether they deducted money from
2    his weekly paycheck, his biweekly paycheck, if he missed
3    a day from work?
4        A.  No.  I don't know.
5        Q.  You don't know that?
6        A.  (Witness shakes head.)
7        Q.  Who would know that?
8        A.  Steven.
9        Q.  The next one is dated April 20th, 2006, and it
10   says $322.50.
11       Do you know what that check was for?
12       A.  No.
13       Q.  Let's go to the next one.  NC0068, it's
14   April 20, 2006.  It is for $1600.
15       Do you know what that check was for?
16       A.  It looks like his salary only.
17       A.  Looks like a salary?
18       A.  Uh-huh.
19       Q.  Do you know whether it's a salary?
20       A.  I'm not sure.
21       Q.  Who would know?
22       A.  We have it on our files.
23       Q.  You have it on your files?
24       A.  Uh-huh.
25       Q.  So it's written somewhere in the files whether

Page 77

1    or not he had a salary; is that correct?
2        A.  Yes.
3        Q.  What's it written as?  Does it say --
4        A.  As salary.
5        Q.  Does it say salary?
6        A.  Yes.
7        Q.  Where would that be?
8        A.  On the Excel spreadsheet I told you about.
9        Q.  On the Excel spreadsheet?
10       A.  Uh-huh.
11       Q.  May 5th, 2006, NC0069, and that's $1112.49.
12       Do you know what that check is for?
13       A.  With this kind of check, this has taxes taken
14   out of it.  So this is not the gross amount that he got
15   paid.
16       Q.  So do you know what he was being paid at this
17   point in May of 2006?
18       A.  I don't remember.
19       Q.  And there would be a deduction?
20       A.  I don't know.
21       Q.  At this point, who was doing the deductions
22   from the checks?
23       A.  It was still the same.  I was doing the
24   payroll.  Steven would give me the amounts to pay and
25   the amounts to deduct.

Page 78

1    Q. Where was the record of that kept at this
2    point?
3    A. At this point, we have it on the payroll
4    company's system. It would have the salary rate and the
5    deductions and then the taxes taken out. This is the
6    check. The check stub which goes to the employee has
7    all the information, and also the payroll company should
8    have it.
9    Q. So at this point, the information is no longer
10   in the Excel spreadsheet, or to the best of your
11   knowledge -- I shouldn't say that.
12       At this point, there is at least a record with
13   the payroll company, right?
14   A. Yes.
15   Q. And there is a record that goes to the
16   client --
17   A. Yes.
18   Q. -- I mean the employee?
19   A. Uh-huh.
20   Q. So is it fair to say that -- I'm going to skip
21   because these look like two more payroll checks, and I'm
22   going to go to one dated 6/12/06. It says Union Bank,
23   and it's 0072.
24       Do you know what this check is for?
25   A. It says cash advance on the bottom.

Page 79

1    Q. Would you have filled in the amount?
2    A. No.
3    Q. Let's go to the last check NC0076, and that
4    says $1,144.50.
5    A. Uh-huh.
6    Q. Do you know what this check is about?
7    A. Looks like his final paycheck. That's what it
8    says at the bottom: Final gas reimbursement and
9    paycheck.
10   Q. Did you make this check out?
11   A. No.
12   Q. Did you make the calculations for this check?
13   A. No, I did not. Because this was his final
14   check, and he had some type of arrangement with Steven
15   regarding the car.
16   Q. Now, earlier, you had -- at any time when Mr.
17   Aranda was paid a salary, do you know whether or not
18   money was deducted from that salary if he missed a day
19   from work?
20   MR. CARLSON: Objection; asked and answered.
21   Don't answer it again.
22   MR. DAL BON: Well, no. She's --
23   MR. CARLSON: We're done with that question.
24   MR. DAL BON: I'm sorry.
25   MR. CARLSON: You have asked it five times.

Page 80

1    MR. DAL BON: No. She's given conflicting
2    answers. She just answered --
3    MR. CARLSON: You have asked the question five
4    times.
5    MR. DAL BON: No, I haven't.
6    MR. CARLSON: You have.
7    MR. DAL BON: This is the third time.
8    MR. CARLSON: You just asked it again one
9    minute ago --
10   MR. DAL BON: I asked --
11   MR. CARLSON: -- she said she didn't know.
12   MR. DAL BON: -- I asked it about that
13   particular pay period. Earlier, she said that when he
14   was making $1200 every week --
15   MR. CARLSON: She said she didn't know. You
16   can read back the transcript if you want. She said she
17   didn't know.
18   (Sotto voce discussion.)
19   MR. DAL BON: Okay. She gave conflicting
20   testimony. And you're not going to let her answer again
21   so that we can clarify?
22   MR. CARLSON: She can answer it again.
23   MR. DAL BON: Okay.
24   Q. Do you know whether anytime, okay, that Mr.
25   Aranda was paid a salary whether or not money was

Page 81

1    deducted from that salary if he missed a day from work?
2    A. I don't know. I was just given the amounts
3    that he was supposed to be paid for.
4    Q. Let's look at Exhibit G, and I'm going to ask
5    you to go to page number 4?
6    MR. CARLSON: Page 4?
7    MR. DAL BON: Yeah.
8    BY MR. DAL BON:
9    Q. Request Number 2, the complete Request Number 2
10   reads, requesting: "The complete payroll records
11   showing the payments made to plaintiff each pay period."
12   MR. CARLSON: Is there a definition of
13   "records" anywhere?
14   MR. DAL BON: Probably earlier.
15   MR. CARLSON: Where?
16   MR. DAL BON: In the preamble.
17   MR. CARLSON: I don't have that here. You
18   didn't give that to us.
19   MR. DAL BON: Well, I don't know because I
20   didn't write this.
21   MR. CARLSON: This is just our response. My
22   question is, do you have a definition of "records" so --
23   obviously, you're trying to figure out whether we have
24   fully responded to this.
25   MR. DAL BON: Right.

Page 82

```
 1        MR. CARLSON:  I can't tell without seeing
 2   your --
 3        MR. DAL BON:  I have a definition.  Any payroll
 4   records, complete payroll records.
 5        MR. CARLSON:  Objection; vague and ambiguous;
 6   and unintelligible.
 7        MR. DAL BON:  Okay.  You have made your
 8   objection.
 9   Q.  Request 2:  "The complete payroll records
10   showing the payments made to plaintiff each pay period."
11        Would that include the Excel spreadsheet?
12        MR. CARLSON:  I'm going to object as calls for
13   a legal conclusion --
14        MR. DAL BON:  No.  I'm asking her --
15        MR. CARLSON:  Let me finish.  It calls for a
16   legal conclusion; beyond the scope of this witness'
17   testimony.  If you have a personal opinion, you can give
18   it.  If you don't, tell him you don't know.
19        THE WITNESS:  I don't know.
20   BY MR. DAL BON:
21   Q.  But the Excel spreadsheet is the only document
22   that shows the deductions that were made from Mr.
23   Aranda's check for alleged cash advances, for alleged
24   payments for car; is that correct?
25   A.  I don't think it's the only one.  The check
```

Page 83

```
 1   stubs that goes with the checks should have that
 2   description as well.
 3   Q.  Even the earlier checks?
 4   A.  Uh-huh.
 5   Q.  So if we don't have those, we don't have the
 6   complete records?
 7   A.  Paulo should have them.  The check stubs go to
 8   the employee.
 9   Q.  But if we weren't given them by the defendants,
10   we do not have the complete records?  They did not give
11   us the complete records?
12        MR. CARLSON:  Given what?
13        MR. DAL BON:  The pay stubs and the Excel
14   spreadsheet.
15        MR. CARLSON:  She just said he has it; we
16   don't.
17        THE WITNESS:  We don't keep the pay stubs.
18   BY MR. DAL BON:
19   Q.  So you don't keep the pay stubs?
20   A.  No.
21   Q.  So the only record that you keep of the
22   deductions, then, is contained within the Excel spread
23   sheet?
24   A.  Yes.
25   Q.  So in order for us to get the complete records,
```

Page 84

```
 1   we need a copy of the Excel spreadsheet as it pertains
 2   to Paul Aranda?
 3        MR. CARLSON:  I'm going to object as
 4   argumentative.  I'm also going to object as vague and
 5   ambiguous as to the term "records"; and that the
 6   plaintiff has not established in any way that a
 7   definition was ever included of that term that would
 8   make an unprinted computer record of an Excel
 9   spreadsheet responsive to this document request.
10   BY MR. DAL BON:
11   Q.  In order to get the complete records, in order
12   to be able to calculate the deductions from his checks,
13   we would need the spreadsheet?
14        MR. CARLSON:  Is that a statement or a
15   question?
16        MR. DAL BON:  It's a question.
17   Q.  We would need that read sheet; isn't that true?
18   A.  I don't know.
19        MR. CARLSON:  If you can answer.
20        THE WITNESS:  I don't know.  If you have the
21   pay stubs, you don't need it.
22   BY MR. DAL BON:
23   Q.  If we don't have the pay stubs?
24   A.  Yes, you need it.
25   Q.  For the time period that Mr. Aranda worked as a
```

Page 85

```
 1   piece worker, we would also need the codes, correct?
 2   A.  Yes.
 3   Q.  And we would need also the Excel spreadsheet,
 4   correct?
 5   A.  It's all in one file.
 6   Q.  Where is that file?
 7   A.  In one of the company computers.
 8   Q.  I believe earlier you testified that it was
 9   also in his personnel file?
10   A.  What?
11   Q.  Payroll records.
12   A.  This, cash advance records and his payroll
13   record is on the Excell spreadsheet.  His piece work
14   records is on a file, and we have paperwork also on
15   that.
16   Q.  So you have paperwork on the piece work?
17   A.  Yes.
18   Q.  And it's in a file?
19   A.  It's in a file.  Not in his personnel file, in
20   the company files.
21   Q.  What of his payroll records is in the personnel
22   file?
23   A.  Payroll?  Each paycheck?
24   Q.  Okay.
25   A.  It's not in his personnel files.  What's on his
```

Page 86

1   personnel files is his cash advance and his car
2   agreement.
3       Q.  And those are on paper?
4       A.  Yes.
5       Q.  And if we don't have those, we would need
6   those, too?
7       A.  Yes.
8       Q.  But we don't, okay.
9       MR. DAL BON:  I don't have any further
10  questions.
11      MR. CARLSON:  Okay.  I have no questions.
12      (Recess taken.)
13      MR. CARLSON:  So for the record, we had
14  scheduled the deposition of plaintiff to take place
15  tomorrow, and counsel for plaintiff has notified us that
16  that deposition is being taken off calendar, and I want
17  to put on the record that we are notifying counsel that
18  we have gone to substantial expense to travel here, to
19  book hotels here and that canceling these depositions
20  creates a great financial burden for us.  I have already
21  cleared my calendar as well through Friday, and we have
22  properly noticed the deposition of the plaintiff for
23  tomorrow.  So we want to make sure that the record is
24  clear that we are going to move to compel to regain
25  these expenses.

Page 87

1       MR. DAL BON:  And on the record, opposing
2   counsel just met and conferred with Adam Wang who is the
3   lead attorney on this case concerning these issues, and
4   it is our opinion that we have just discovered documents
5   that have to do with payroll which is the heart of this
6   case pertaining to our plaintiff and were not produced
7   to us despite our written requests and their assurances
8   at least two times that they had produced all the
9   documents, and that's it.
10      MR. CARLSON:  Let me just respond just for the
11  record.  The document that was admitted as Exhibit G
12  contains the request, and it is our position that the
13  documents that they are talking about which may or may
14  not exist -- I'm not even sure if they do still exist --
15  but if they do, they are not responsive to a single
16  request therein; however, I want the record to be clear
17  that the defendants have always cooperated during
18  discovery and we are not ruling out the possibility
19  of finding those documents and producing them
20  voluntarily.
21      MR. DAL BON:  Of course, we have a different
22  opinion, but that's it.
23      (Time ending:  2:12 p.m.)
24
25

Page 88

1   STATE OF _____)
                        )  SS.
2   COUNTY OF _____)
3
4
5
6
7       I, the undersigned, declare under penalty of
8   perjury that I have read the foregoing transcript, and I
9   have made any corrections, additions or deletions that I
10  was desirous of making; that the foregoing is a true and
11  correct transcript of my testimony contained therein.
12      EXECUTED this_____ day of _____,
13  20_____, at_____, _____.
                [City]        [State]
14
15
16
17
18
19
20
21      _____
22          DANIELLE SILVA
23
24
25

Page 89

1       REPORTER'S CERTIFICATE
2
3
4       I, NANCY E. PRESANT-McDONALD, CSR No. 9906,
5   Certified Shorthand Reporter, certify;
6       That the foregoing proceedings were taken
7   before me at the time and place therein set forth, at
8   which time the witness was put under oath by me;
9       That the testimony of the witness, the
10  questions propounded, and all objections and statements
11  made at the time of the examination were recorded
12  stenographically by me and were thereafter transcribed;
13      That the foregoing is a true and correct
14  transcript of my shorthand notes so taken.
15      I further certify that I am not a relative or
16  employee of any attorney of the parties, nor financially
17  interested in the action.
18      I declare under penalty of perjury under the
19  laws of California that the foregoing is true and
20  correct.
21      Dated this 18TH day of JUNE, 2007.
22
23      _____
23
24      NANCY E. PRESANT-McDONALD, C.S.R. No. 9906
25